IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:06-CR-21 |
| ) | (PHILLIPS/GUYTON) |
| TERRY DENNIS JONES, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court pursuant to defendant, Terry Dennis Jones's Motion to Suppress [Doc. 30] regarding the seizure of cocaine, "crack" and a firearm following a stop and search of the defendant and his vehicle on February 20, 2006. All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. An evidentiary hearing was held on February 23, 2007. Assistant United States Attorneys Steven Cook and Tracee Plowell were present representing the government. Attorney Richard L. Gaines was present representing the defendant. The defendant was also present. Following the hearing, the defendant requested leave to file a post-hearing brief, which was granted. The defendant filed a brief [Doc. 51] on April 2, 2007. The government advised the Court on April 10, 2007 that it would not file a post-hearing brief, or a reply to the defendant's brief, and therefore, this matter became ripe for the Court's consideration on that date.

1

The defendant, Terry Dennis Jones ("Jones") has been indicted [Docs. 7, 40] on three (3) counts of possession with intent to distribute cocaine base ("crack"), a Schedule II controlled substance, a violation of 21 U.S.C. § 841; one (1) count of possession with intent to distribute cocaine, a Schedule II controlled substance, a violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B); one (1) count of possessing and brandishing a firearm in furtherance of drug trafficking, a violation of 18 U.S.C. § 924(c)(1)(A)(ii); and one(1) count of being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). All but one of these charges arise out of the seizure of certain items, namely crack cocaine, from the defendant's person, and cocaine, crack and marijuana found in the car being driven by Jones on February 20, 2006[1]. Just prior to the seizure of these items, officers of the Knoxville Police Department ("KPD") pulled in behind Jones's car, which had just parked at a business, and then arrested Jones after he attempted to flee. The government alleges that while Jones struggled with officers prior to being arrested, he got control of one of the officer's firearms and attempted to use it against the officers. [Doc. 37].

Jones has moved to suppress all items of evidence seized on February 20, 2006, alleging that the KPD officers needed, but lacked, "probable cause" or "reasonable suspicion" to stop Jones in the first place, and therefore, the items seized after the traffic stop were obtained in violation of defendant's Fourth Amendment rights. In response, the government alleges that under either a "reasonable suspicion" standard or the higher "probable cause" standard, officers had adequate grounds to believe that Jones was a wanted fugitive, with one or more outstanding arrest warrants. The government's position is that the officers made a legitimate stop of Jones, arrested

---

[1]Count One of the Superseding Indictment [Doc. 40] alleges that Jones possessed with intent to distribute crack on November 5, 2004, an event not addressed by the present motion.

2

him pursuant to the arrest warrants, and then seized the cocaine and crack pursuant to a standard search incident to arrest of the defendant's person and his vehicle. [Doc. 37].

## I. FACTS

At the evidentiary hearing on this motion, the government called as its witness, Bruce Conkey ("Conkey"), an officer with the KPD. Conkey testified that he works with the organized crime unit and that he has worked in that capacity for approximately eleven (11) years. He is a task force officer with the Drug Enforcement Administration ("DEA").

Conkey related his background and familiarity with working drug crimes in East Knoxville. He then testified that the general area around the 2500 block of Martin Luther King, Jr. Boulevard ("MLK") and the area around Magnolia Avenue and Beaman Street are high crime areas, characterized by high rates of robbery, assaults, and drug arrests.

Conkey testified that on August 15, 2005 his supervisor, Lieutenant Price ("Price"), gave him a piece of paper on which had been written the name of "Terry Dennis Jones", along with a date of birth, race and sex information, specifically, a black male. Price told Conkey that officers in Williamson County, Tennessee had attempted to stop Jones, but that Jones fled from the vehicle and was not apprehended. However, the officers found, according to Price, three (3) kilograms of cocaine in the trunk of the vehicle which Jones had been driving. Price asked Conkey to be on the lookout for Jones, and Conkey assumed that an arrest warrant for Jones would be issued. Conkey then obtained a mug shot photograph of Jones. The photograph of Jones was identified by Conkey, marked as Exhibit 1 and received into evidence.

Conkey then called some of his sources in an effort to locate Jones. According to Conkey, one source told him that Jones was selling drugs, but the source did not know any other information at that time. Conkey asked his informants to let him know if they saw Jones.

On February 15, 2006, Conkey received a call from an informant, who told Conkey that someone named Terry Jones was selling drugs in the Knoxville area. Conkey then spoke with Special Agent Todd Lee ("Lee") with the DEA and shared the informant's information with him. Another KPD officer, Ed Kingsbury ("Kingsbury") was present and overheard the conversation between Conkey and Lee. Kingsbury told Conkey that in December, 2005, Williamson County Officers had been in Knoxville with an arrest warrant for Jones, trying to find him. Kingsbury then did computer research and found that Jones also had outstanding warrants in Knox County. Kingsbury printed off photographs of Jones from his computer, and he gave them to Conkey. Conkey kept those photographs of Jones on his desk until Jones was arrested on February 20, 2006. Two (2) photos of Jones given to Conkey by Kingsbury were marked as Exhibit 4A and 4B, identified by the witness, and received into evidence. A criminal history record for Jones was marked as Exhibit 4C, identified by the witness and received into evidence.

Kingsbury and Conkey looked at the information on Kingsbury's computer and saw that Jones had several outstanding warrants in Knox County. Exhibit 5A was identified by Conkey as the Person Information Sheet on Jones, which was read by Conkey on February 15, 2006. Exhibit 5B was marked and identified by the witness as the Warrant Summary for Jones. It was printed on February 20, 2006 and shows several outstanding arrest warrants for Jones. Exhibit 5A and 5B were received into evidence.

Exhibit 6 was identified by Conkey as copies of the warrants for Jones which were on file, and which were seen on the computer by the witness on February 15, 2006. Exhibit 6 was marked and received into evidence.

On February 20, 2006, Conkey was working with Officer Jeremy Maupin ("Maupin"). Maupin had asked Conkey to assist him in investigating some complaints in the East Knoxville area. In the course of doing that, Conkey and Maupin were driving on MLK. Conkey saw a man he knew, Carl Rader ("Rader"), standing outside of a strip mall in the 2500 block of MLK. Conkey saw that Rader was talking to someone who was sitting inside a Chevrolet Suburban. Conkey recognized Rader as a known drug dealer and someone Conkey had arrested in the past. Conkey pulled into the parking lot to observe Rader. Conkey further testified that he was driving an unmarked Cadillac Escalade, with tinted windows. Conkey described the vehicle as an undercover car.

A diagram of the roads and buildings at the 2500 block of MLK was identified by the witness, marked as Exhibit 10, and admitted into evidence. Using the diagram, Conkey testified that Rader was standing outside the driver's window, talking to the driver in the Suburban. Conkey parked his vehicle so that he could see the person with whom Rader was talking inside of the Suburban.

Conkey testified that a white SUV then pulled into the parking lot and blocked Conkey's view of Rader and the Suburban. Conkey identified the vehicle as a Buick Rendezvous, a sport utility vehicle. Conkey testified that he has measured the distance and that he was approximately 28-30 feet at most from the Buick SUV. He was facing the driver's door of the Buick. Conkey looked at the driver of the Buick SUV as the driver rolled down his window.

5

Conkey testified that he recognized the driver as someone who looked familiar, but he did not immediately place a name with the face. Conkey stated that the time was approximately 12:50 p.m., it was sunny and that he was able to clearly see the driver of the Buick SUV.

As he was observing the Buick SUV, Conkey received a cell phone call from an informant. This caller told Conkey that the person driving the Buick SUV was Jones. Conkey testified that the informant who called him was a source with whom he had spoken earlier about trying to find Jones. Conkey testified that upon receiving this phone call from the informant, it "clicked" in his mind that the person in the Buick SUV was the Jones who was in the mug photo he had received on February 15, 2006. Conkey said that he could clearly identify Jones at that point.

Conkey then planned for the arrest of Jones based on the outstanding warrants. Conkey testified that he told Maupin to call dispatch and request marked units to stop Jones. Conkey explained that he was in an unmarked vehicle, which did not have lights and sirens. Therefore, he wanted officers in uniform and fully equipped vehicles to stop Jones so that he would know that he was being stopped by the police.

Conkey testified that as Maupin was making the call for uniformed officers, Jones pulled out of the parking lot and traveled east bound on MLK. The government then played an audiotape which contained Maupin's call to dispatch. In the course of his call, Maupin stated that Jones could be armed and might attempt to flee. Conkey testified that he had given that information to Maupin, because Conkey remembered that Jones had fled from officers in Williamson County, and that Jones was a fugitive.

Conkey and Maupin followed Jones along several different streets until Jones pulled into the parking lot of a business called the Philippine Connection. Conkey testified that he pulled his vehicle into a space to the right of Jones's vehicle. Then Officer Burchfield pulled his vehicle in behind Jones's vehicle. Another marked vehicle, driven by Officer Pack, pulled in behind Burchfield's vehicle.

Conkey testified that Officer Burchfield gave Jones orders to come out of his vehicle. Conkey saw Jones outside of the vehicle, with his hands up, as if he was about to surrender. Conkey then saw the other officers begin running, as Jones had fled, and they were chasing him. Maupin caught Jones by tackling him. The government then played the videotape from the video camera inside of Officer Pack's vehicle. The video was marked as Exhibit 9 and received into evidence. The videotape shows Jones emerging from his vehicle with his hands raised and then officers chasing Jones as he attempts to flee.

On cross examination, Conkey testified that he prepared an investigative action report relative to this matter approximately a week after the arrest of Jones. Conkey testified that he reviewed this report prior to testifying at the hearing.

Conkey again testified that in February, 2006, he reviewed photographs of Jones pursuant to conversations regarding efforts to locate Jones based on outstanding arrest warrants. Conkey also confirmed that there were several active warrants on Jones in February, 2006.

Conkey then reviewed a map, or diagram, of the area around the 2500 block of MLK. Conkey confirmed that the map is generally a fair representation of how the area appears. Using the map, Conkey again related the scenario of how he saw Rader, pulled around the parking lot, parked in a position to observe Rader, and then saw the Jones vehicle pull in between Conkey's vehicle and

7

Rader. In addition, Conkey testified that after the Jones vehicle pulled into the parking lot, a person came out of a nearby business, Strickland StreetWear, stood on the sidewalk, and had some kind of conversation with Jones. The map then was marked as Exhibit 12 and received into evidence.

Conkey testified again that he received a call from an informant while Jones's vehicle was parked in the parking lot. Conkey testified that the C.I. number for the informant who called him is C.I. no. 1314. Conkey testified that C.I. no. 1314 is a confidential informant for the DEA, as well as for the KPD. Conkey testified that he has worked with this particular C.I. for approximately three (3) years and on numerous occasions. Conkey testified that this particular C.I. had provided information which lead to the capture of approximately ten (10) persons who were wanted on different charges. Conkey testified that the informant, C.I. no. 1314, who called Conkey and advised that Jones was in the Buick SUV, was in a location where he could see that Jones was driving that vehicle.

Conkey testified again that after he identified the defendant as being the Terry Jones who was being sought for arrest, he made the decision to have him stopped. He then told Maupin to call for marked units to make the stop and the arrest. Conkey testified that he did not see Jones violate any traffic laws before Jones was stopped and arrested.

Conkey testified that he observed Jones for two to three (2-3) minutes before he identified him. Conkey testified that Maupin did not call in the license plate on Jones's vehicle, because they did not have time to do that, as they were attempting to pull out and follow the Jones vehicle. Instead, Conkey testified that as they were following the SUV they gave the location of the SUV to dispatch and marked units.

Conkey testified that he had never met Jones, and only knew his appearance based upon the photographs he had been given. Conkey does not remember ever having any dealings with Jones and no recollection of having arrested him. Conkey testified that Maupin did not mention the name of Terry Jones to dispatch as they were calling in the request for the marked units.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. United States v. Ferguson, 8 F.3d 385, 388 (6th Cir. 1993). It is well settled that police may initiate a stop of a person if they have a reasonable suspicion, grounded in specific and articulable facts, that the person is wanted in connection with a felony. United States v. Hensley, 469 U.S. 221, 229 (1985).

The defendant questions whether Conkey had probable cause or even reasonable suspicion, to believe the defendant, in fact, was the Terry Jones wanted on several outstanding arrest warrants. [Doc. 51]. He argues that it was the call from the C.I., not Conkey's identification of Jones, which caused Conkey, and other officers, to stop Jones.

The government argues that based upon Conkey's knowledge of Jones's appearance, and Conkey's identification of Jones, Conkey had not just reasonable suspicion, but probable cause to believe that the defendant was Terry Jones, a wanted fugitive. Accordingly, the government states that the stop was proper, the arrest was proper, and the search of the vehicle and of Jones's person were valid as a search incident to arrest. [Doc. 37].

Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). The Sixth Circuit examined in detail the showing necessary to establish probable cause in United States v. Barrett:

> The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 244 n.13, 103 S. Ct. 2317, 2335 n.13, 76 L. Ed. 2d 527 (1983). As noted in Texas v. Brown, 460 U.S. 730, 742, 103 S. Ct. 1535, 1543, 75 L. Ed. 2d 502 (1983):
>
>> [P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. (citations omitted).
>
> Moreover, the existence of probable cause should be determined on the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed .2d 527 (1983). This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective.

890 F.2d 855, 861 (6th Cir. 1989), superseded on other grounds by 18 U.S.C. § 3742(e); see also Ferguson, 8 F.3d at 392 (also quoting this passage from Barrett).

Conkey testified as follows on his identification of Jones, which occurred before he decided to stop Jones's vehicle:

> Q. All right. And at that point what did you do?
>
> A. I looked at him [Jones] and then, you know, it clicked just like someone when you - you see someone you know, you try and figure out who it is, and then someone walks up and says, hey, you know, such and such, you met them there, it's just like an incident like that.

10

> As soon as I seen him, it was the picture that I pulled up originally. He looked just like him, with the picture that I had five days prior.
>
> Q. All right. You had received that five days prior. Where had the picture been in the five days in between?
>
> A. Laying on my desk, where I could look at it anytime I was walking to my desk and sit down.
>
> Q. But you say it did click for you who it was?
>
> A. Yes. I could clearly identify it was Terry Jones at that point, that was the same as the picture.
>
> · · · · ·
>
> Q. At that point in time, was there any question in your mind about who that was?
>
> A. No, there was no question in my mind at that time.

(Tr. 59-61).

The Court finds that the testimony of Conkey is not contradicted or impeached, that it is reasonable, and therefore, that it is credible. The Court finds that Conkey recognized Jones and identified him based on the photographs which he had been given. Conkey knew Jones was a wanted fugitive, with several outstanding arrest warrants. Acting on this identification, Conkey reasonably called for marked police vehicles to stop Jones. Because Conkey positively identified Jones, based on photographs of Jones, as the driver of the subject vehicle, before initiating officers to approach and stop the vehicle, officers had at least reasonable suspicion to seize the vehicle and Jones. United States v. Hudson, 405 F.3d 425, 434 (6th Cir. 2005).

The fact that a confidential informant called Conkey and prompted Conkey to recognize and identify Jones is of little moment. The controlling fact is that Conkey independently

identified Jones after receiving the call. Conkey did not rely on the content of the call to stop and arrest Jones. He relied on his own identification of Jones, based on the photographs of Jones which he had been provided.

Because officers properly stopped the defendant, they could arrest the defendant on the outstanding warrants. At that point, officers, incident to the arrest, could search the defendant. United States v. Hughes, 398 F.2d 63, 64 (6th Cir. 1990). Officers also could search the interior of the defendant's car incident to the custodial arrest. New York v. Belton, 453 U.S. 454, 460 (1981).

### III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress [Doc. 30] be **DENIED.**[2]

                                                Respectfully submitted,

                                                   s/ H. Bruce Guyton
                                                United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).